SEALED

# UNITED STATES DISTRICT COURT

for the

Eastern District of California

FILED

MAR 15 2016

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY [signature]
DEPUTY CLERK

United States of America
v.
Osvaldo Hernandez,
Hector Gonzalez,
Christopher McCurin,
Noe Baeza-Bravo and
Vidal Gonzalez
*Defendant(s)*

Case No. 2:16-mj-062 KJN

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about between the date(s) of July 3, 2014 and February 3, 2016 in the county of Sacramento in the Eastern District of California, the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| **Defendants:**<br>21 U.S.C. § 841(a)(1) | **Osvaldo Hernandez, Hector Gonzalez, Noe Baeza-Bravo and Vidal Gonzalez-**<br>Distribution of Controlled Substance |
| **Defendant:**<br>18 U.S.C. § 922(a)(1)(A)<br>18 U.S.C. § 922(g)(1) | **Christopher McCurin-**<br>Unlicensed Dealing in Firearms;<br>Felon in Possession of Firearm; |

This criminal complaint is based on these facts:

(see attachment)

☒ Continued on the attached sheet.

[signature]
*Complainant's signature*

FBI, SA Preston H. Patton
*Printed name and title*

Sworn to before me and signed in my presence.

Date: March 15, 2016

[signature]
*Judge's signature*

City and state: Sacramento, CA

Kendall J. Newman, U.S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT OF FBI SA PRESTON H. PATTON**
**IN SUPPORT OF CRIMINAL COMPLAINT**
**AND IN SUPPORT OF APPLICATION FOR SEARCH WARRANTS**

**CONTENTS**


I. INTRODUCTION .......... 1

A. Background and Experience .......... 1

B. Basis of Information .......... 1

C. Purpose of Affidavit .......... 2

II. STATEMENT OF PROBABLE CAUSE .......... 4

A. Overview of the Investigation .......... 4
1. Terms .......... 4
2. Persons Working with FBI on this Investigation .......... 4
3. Targets of this Investigation .......... 6
4. One-paragraph Summary of the Investigation .......... 6

B. Details of the Investigation .......... 7
1. June 13, 2014 Controlled Buy (Guns) (Vidal) .......... 7
2. July 3, 2014 Controlled Buy (Drugs) (Vidal) .......... 8
3. July 29, 2014 Controlled Buy (Drugs) (Vidal) .......... 9
4. August 20, 2014 Controlled Buy (Drugs, Gun) (Vidal, Baeza-Bravo) .......... 9
5. October 8, 2014 Controlled Buy (Drugs, Guns) (Vidal, Baeza-Bravo) .......... 10
6. December 18, 2014 Controlled Buy (Drugs) (Vidal) .......... 11
7. April 16, 2015 Controlled Buy (Drugs) (Baeza-Bravo) .......... 12
8. April 20, 2015 Controlled Buy (Gun) (Baeza-Bravo; Gonzalez) .......... 13
9. May 12, 2015 Controlled Buy (Drugs) (Baeza-Bravo; Gonzalez) .......... 14
10. May 21, 2015 Controlled Buy (Gun) (Baeza-Bravo) .......... 15
11. May 28, 2015 Controlled Buy (Drugs) (Gonzalez) .......... 16
12. June 3, 2015 Controlled Buy (Drugs) (Gonzalez) .......... 16
13. June 30, 2015 Controlled Buy (Gun) (Gonzalez) .......... 17
14. July 17, 2015 Controlled Buy (Drugs, Gun) (Gonzalez) .......... 18
15. August 12, 2015 Controlled Buy (Drugs) (Gonzalez) .......... 18
16. September 2, 2015 Controlled Buy (Drugs) (Gonzalez) .......... 19
17. September 16, 2015 Recorded Conversation (Gun) (Gonzalez, McCurin) .......... 20
18. September 16, 2015 Recorded Conversation (Drugs) (Gonzalez, Hernandez) .......... 20
19. September 18, 2015 Controlled Buy (Drugs, Gun) (Gonzalez) .......... 20
20. September 19, 2015 Recorded Conversation (Guns) (Gonzalez, McCurin) .......... 21
21. September 24, 2015 Recorded Conversation (Guns) (Gonzalez, McCurin) .......... 22
22. September 29, 2015 Recorded Conversation (Guns) (Gonzalez, McCurin) .......... 22
23. October 7, 2015 Controlled Buy (Drugs) (Gonzalez, Hernandez) .......... 22
24. October 13, 2015 Recorded Conversation (Guns) (Gonzalez, McCurin) .......... 23
25. December 17, 2015 Cocaine Sample Acquisition (Hernandez) .......... 24
26. December 22, 2015 Controlled Buy (Drugs) (Hernandez) .......... 24
27. February 3, 2016 Controlled Buy (Drugs) (Hernandez) .......... 26

C. Additional Investigation-related Intelligence and Surveillance .......... 26
1. Identification of Targets .......... 26
2. Identification of Locations in Table Three .......... 27
3. McCurin's Felony Record .......... 29
4. Ongoing Communication between Gonzalez and McCurin .......... 30
5. Status of Mariscos El Camaron .......... 30

D. Information Derived from Training and Experience .......... 30

III. CONCLUSION .......... 34

IV. REQUEST TO SEAL .......... 36

ATTACHMENT A: PLACES TO BE SEARCHED .......... 37

ATTACHMENT B: ITEMS TO BE SEARCHED FOR AND SEIZED .......... 41

Locations A-1, A-2, and A-3 .......... 41

Location A-4 .......... 42

[*Remainder of page blank.*]

I, Preston H. Patton, being duly sworn, state the following:

# I. INTRODUCTION

## A. Background and Experience

1. I am a Special Agent (SA) with the Federal Bureau of Investigation (FBI) and have been so employed for approximately 1 year. I am assigned to the Sacramento Division. I have completed 20 weeks of FBI Basic Agent training at the FBI Academy at Quantico, Virginia. During the course of my employment with the FBI, I have been assigned to a criminal squad, but have assisted other squads, to include; national security, white collar and cyber security matters. I am currently assigned to the Violent Crimes Squad, working Transnational Organized Crime, which investigates violations of the Controlled Substance Act, Title 21 of the United States Code, including Sections 841(a)(1) and 846, Controlled Substance violations and Conspiracy to Distribute Controlled Substances.

2. I am familiar with investigations of drug trafficking organizations, methods of importation and distribution of controlled substances. I have participated and been trained in Federal and State search warrants involving controlled substances, seizure of narcotics related records and other types of evidence that document the activities of criminal organizations in both manufacturing and distribution of controlled substances. I have utilized a variety of investigative techniques and resources, including physical and electronic surveillance and various types of infiltration, including the use of Confidential Sources, hereinafter "CS," to assist with investigations. Through participation in investigations, my training and experience, and conversations with other experienced agents and law enforcement personnel, I have become familiar with the methods used by traffickers to smuggle and safeguard narcotics, to distribute narcotics, and to collect and launder related proceeds. I have been made aware of tactics that are often used to attempt to thwart investigations of narcotics organizations. My knowledge of these tactics, which include the utilization of numerous and different cellular telephones, counter-surveillance equipment and techniques, false and/or fictitious identities, and coded communications and conversations, have been particularly useful and relevant in this investigation.

## B. Basis of Information

3. The information contained in this Affidavit is based upon the observations of other law enforcement officers, my review of official government reports, audio and video recordings and the controlled purchases or "buys" of quantities of controlled substances utilizing one CS. Because this Affidavit is being submitted for the limited purpose of securing Search Warrants and Arrest Warrants, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts I believe are necessary and appropriate to establish probable cause for the warrants requested herein.

## C. Purpose of Affidavit

4. The purpose of this affidavit is twofold. Its first purpose is to obtain arrest warrants for the following five individuals, as summarized in **Table One**:

| **Table One** |
|---|
| 1 - Osvaldo **Hernandez** (hereinafter "**Hernandez**")<br><br>DOB XX-XX-1983. Hispanic male, with black hair and brown eyes. Approximately 5'10" and 170 pounds.<br><br>2 - Hector **Gonzalez** (hereinafter "**Gonzalez**")<br><br>DOB XX-XX-1979. Hispanic male, with black hair and brown eyes. Approximately 5'4" and 130 pounds.<br><br>3 - Christopher **McCurin** (hereinafter "**McCurin**")<br><br>DOB XX-XX-1976. African-American male, with black hair and brown eyes. Approximately 6'2" and 250 pounds.<br><br>4 - Noe **Baeza-Bravo** (hereinafter "**Baeza-Bravo**")<br><br>DOB XX-XX-1985. Hispanic male, with black hair and brown eyes. Approximately 6'2" and 190 pounds.<br><br>5 - **Vidal** Gonzalez (hereinafter "**Vidal**")<br><br>DOB XX-XX-1959. Hispanic male, with black hair and brown eyes. Approximately 5'11" and 180 pounds. |

[***Remainder of page blank.***]

5. To that end, this affidavit seeks to establish probable cause to believe that those five individuals have, in the Eastern District of California, engaged in conduct that constitutes a violation of the following criminal laws, as listed in **Table Two**:

| **Table Two**[1] | |
|---|---|
| 1 - **Hernandez** | 21 U.S.C. § 841(a)(1), Distribution of Heroin<br>21 U.S.C. § 841(a)(1), Distribution of Cocaine<br>21 U.S.C. § 841(a)(1), Distribution of Methamphetamine |
| 2 - **Gonzalez** | 21 U.S.C. § 841(a)(1), Distribution of Heroin<br>21 U.S.C. § 841(a)(1), Distribution of Methamphetamine |
| 3 - **McCurin** | 18 U.S.C. § 922(a)(1)(A), Unlicensed Dealing in Firearms<br>18 U.S.C. § 922(g)(1), Felon in Possession of Firearm |
| 4 - **Baeza-Bravo** | 21 U.S.C. § 841(a)(1), Distribution of Methamphetamine |
| 5 - **Vidal** | 21 U.S.C. § 841(a)(1), Distribution of Methamphetamine |

6. Its second purpose is to obtain search warrants for the four locations specified in **Attachment A** (incorporated herein by reference). To that end, this affidavit seeks to establish probable cause to believe that the items specified in **Attachment B** (also incorporated herein by reference) are, or will be, at those four specified locations in **Attachment A**, and that those items all constitute: evidence of the crimes alleged in **Table Two**; contraband, fruits of the crimes alleged in **Table Two**, or other items illegally possessed; or property designed for use, intended for use, or used in committing the crimes alleged in **Table Two**.

[***Remainder of page blank.***]

[1] Note that **Table Two** does not purport to capture all the criminal activity that **Hernandez, Gonzalez, McCurin, Baeza-Bravo**, and **Vidal** have engaged in during the course of this investigation. It does not even purport to capture all the criminal activity that this Affidavit demonstrates these individuals have engaged in. Instead, it only lists the offenses in connection with which arrest warrants are sought.

# II. STATEMENT OF PROBABLE CAUSE

## A. Overview of the Investigation

7. The Federal Bureau of Investigation's (FBI's) Violent Crime Squad 1 (VC-1). VC-1 has been investigating Operation "Smokin' Slingshots" since June 2014.

### 1. Terms

8. Throughout this application, the below-listed set of terms, created by and commonly used by law enforcement, may be used to describe some of the techniques and tactics used to obtain the probable cause set forth in this Affidavit:

a. **Controlled Buy** - During a controlled narcotics buy, law enforcement officers search a Confidential Source's (CS') vehicle and person before and after the buy. This is done to ensure that no additional money, narcotics and/or weapons are taken to the buy or brought back from the buy. During the buy, the CS is generally provided with an audio and/or video recording device to record the transaction and a transmitter to allow law enforcement officers to monitor the transaction and execute a rescue if the CS' safety is compromised. All of the narcotics buys documented in this Affidavit were controlled buys. Other terms that are relevant in understanding a "controlled buy" are "buy funds" and "transport vehicle," which are defined below.

b. **Staging Area** - The term "staging area" refers to the pre-determined location, chosen by law enforcement, to prepare the CS to conduct a controlled buy, and often, return from the buy. At the staging area, the CS is provided with electronic monitoring equipment, buy funds and briefed regarding the objectives of the operation and safety considerations. The CS' vehicle and person are searched for weapons, money, and/or contraband at the staging area.

c. **Buy Funds** - The term "buy funds" refers to the funds provided by law enforcement to the CS, to successfully conduct the controlled purchase of drugs and/or firearms.

d. **Transport Vehicle** - The term "transport vehicle" refers to the law enforcement vehicle used to transport CS-1 to the controlled buy location. CS-1 is dropped off on foot in the vicinity of the controlled buy location. Surveillance teams will maintain a visual of CS-1 to and from the transport vehicle and the controlled buy location.

### 2. Persons Working with FBI on this Investigation

9. This investigation included the use of a CS and UCs (Undercover Employee) to conduct controlled firearms, methamphetamine, heroin and cocaine buys. For the purpose of this Affidavit, one CS (referred to as "CS-1") and three UCs (referred to as "UC-1," "UC-2," and "UC-3") were used to conduct controlled buys. CS-1 and UC-1, UC-2 and UC-3 are characterized below.

10. In 2013, Sacramento Police Department (SPD) Detective, Gang Unit, provided an SPD Task Force Officer, FBI SSTF, the name of CS-1. The SPD Detective stated that CS-1 had connections to drug and possible cartel related targets. Members of VC-1 identified and located CS-1.

11. CS-1, who had previously worked as a CS for the Department of Homeland Security, was officially opened as an FBI CS, on May 14, 2014. CS-1 has participated in several previous successful narcotics and weapons investigations and the information CS-1 provided was proven to be reliable based on corroborating information.[2] CS-1 is cooperating with law enforcement for monetary gain. CS-1 has two prior felony convictions, including first degree burglary in 2012 and false imprisonment in 2014, and other misdemeanor convictions.[3] Because of his/her cooperation, Placer County District Attorney's Office also provided him/her with a benefit when CS-1 was facing a probation violation. In addition, on October 3, 2015, CS-1 was arrested for two misdemeanor charges (14.601 – Driving on a Suspended License and Penal Code 148– Willfully Resisting, Delaying or Otherwise Obstructing a Law Enforcement Officer While in the Performance of Their Duties), but the Placer County District Attorney's Office declined the charges. Further, CS-1 has had unrecorded conversations and text messaging with targets. Sometimes, these contacts include discussions about narcotics. The CS-1 does not report all details of these contacts to the FBI. However, many of the conversations with the **Hernandez**, **Gonzalez**, **Baeza-Bravo**, and **Vidal** have been recorded and documented by the FBI. Moreover, the FBI has taken advantage of opportunities to confirm the veracity of CS-1. For example, in April 2015, CS-1 provided agents with text message conversations that CS-1 had with an FBI target that is unrelated to this investigation. In the text messages, the target told CS-1 that he had small marijuana plants for sale. Target exchanged a few text messages with CS-1 regarding the marijuana plants, how they would be transported and when the target and CS-1 would be getting together. CS-1 stated that he/she did not purchase the marijuana plants, referenced in the text messages. CS-1 did go to the target's residence to socialize, but told the target that he/she did not want the plants. Agents used this situation as an opportunity to test the veracity of CS-1. Agents requested that CS-1 place a consensually monitored telephone call with the target to confirm that he/she did not purchase any plants from the target. During the consensually monitored telephone call, the target confirmed with CS-1 that the plants were available.

12. During this investigation, information provided by CS-1 has been corroborated by controlled purchases, toll records, surveillance, and recordings (voice, text messages, and body wires). I am not aware of CS-1 providing false or misleading information during this investigation. For these reasons, I believe CS-1 is reliable.

13. UC-1 utilized in this investigation is a Special Agent with the FBI and received his/her FBI undercover certification on November 9, 2012. Since UC-1's undercover certification, he/she has participated in numerous FBI gang, narcotics and white collar investigations.

14. UC-2 utilized in this investigation is a Special Agent with the FBI and received his/her FBI undercover certification on April 16, 2010. Since UC-2's undercover certification, he/she has participated in numerous FBI narcotics, white collar and counter-terrorism investigations.

---

[2] The majority of the consensually recorded conversations were recorded in Spanish. Agents have preliminary summaries of the recorded conversations.

[3] NCIC records can be difficult to interpret; the information provided in this affidavit is the affiant's best understanding of the records provided.

15. UC-3 utilized in this investigation is a Special Agent with the FBI and received his/her FBI undercover certification on March 19, 2015. Since UC-3's undercover certification, he/she has participated in several FBI narcotics investigations.

### 3. Targets of this Investigation

16. The targets of this investigation are, again, the persons specified above in **Table One**: **Hernandez**, **Gonzalez**, **McCurin**, **Baeza-Bravo** and **Vidal**.

### 4. One-paragraph Summary of the Investigation

17. Since June 2014, CS-1, with assistance from the UCs, has conducted numerous controlled drug and/or gun buys from **Hernandez**, **Gonzalez**, **Baeza-Bravo** and **Vidal**. To date, one half pound of heroin, 156 grams of cocaine, eight and one half pounds of methamphetamine and ten assault rifles have been seized a result of 19 different controlled gun and/or drug controlled undercover operations. Further, a court-authorized wiretap interception of **Gonzalez's** telephone revealed that **Gonzalez** was brokering gun transactions for **McCurin**. Outlined below are specific details relevant to the controlled undercover operations.

[***Remainder of page blank.***]

## B. Details of the Investigation

18. The following paragraphs use abbreviations to refer to certain physical locations. Those abbreviations may be summarized as follows, in **Table Three**:

| Table Three[4] | |
|---|---|
| **A-1** | 2025 28th Street, #103, Sacramento, California:<br>Residence of **Hernandez**.<br>For the basis of that statement, see page 27. |
| **A-2** | 510 Bowman Avenue, Sacramento, California:<br>Residence of **Gonzalez**.<br>For the basis of that statement, see page 28. |
| **A-3** | 3134 Northgate Boulevard, Sacramento, California:<br>Mariscos El Camaron Restaurant, associated with **Gonzalez**.<br>For the basis of that statement, see page 28. |
| **A-4** | 420 Wintergarden Avenue, Sacramento, California:<br>Residence of **McCurin**.<br>For the basis of that statement, see page 29. |
| **A-5** | 3610 Martin Luther King Boulevard, Sacramento, California:<br>Residence of **Vidal**.<br>For the basis of that statement, see page 29.<br>[***Not seeking a search warrant for this property***.] |
| **A-6** | 1655 Scarlett Ash Avenue, Sacramento, California:<br>Residence of **Baeza-Bravo**.<br>For the basis of that statement, see page 29.<br>[***Not seeking a search warrant for this property***.] |

### 1. June 13, 2014 Controlled Buy (Guns) (Vidal)

19. On June 13, 2014, CS-1 conducted a controlled assault rifle buy with **Vidal** at **A-5**.

[4] Note that the list of physical locations in **Table Three** is similar to, but more extensive than, the list of the four locations specified in **Attachment A**. Specifically, **Attachment A** omits **A-5** and **A-6**. Rather, and consistent with **Attachment A**, this affidavit only seeks warrants authorizing search of **A-1**, **A-2**, **A-3**, and **A-4**.

20. Prior to the controlled buy, FBI personnel briefed CS-1 regarding the objectives of the operation and safety considerations. CS-1 did not have weapons and/or contraband. CS-1 was provided with recording devices/transmitter and $2,000 in buy funds for the purchase of two assault rifles and ammunition.

21. CS-1 departed on foot from the transport vehicle to **A-5**, while under FBI surveillance.

22. CS-1 paid **Vidal** and an unknown Hispanic male adult $1,820.00 in exchange for two AR-15s, two high capacity magazines and 20 rounds of ammunition. **Vidal** showed CS-1 his own pistol. **Vidal** told the CS-1 that they could get him/her AR-15s, AK-47s and grenades.

23. A fourth person who was present drove CS-1 away from the controlled buy location and dropped CS-1 off near the undercover transport vehicle, while under visual observation by the FBI.

24. At the staging area, the recording devices/transmitter, two assault rifles, ammunition and $180 cash were recovered. CS-1 purchased two assault rifles and ammunition for $1,820.

25. CS-1's person was searched for weapons and/or contraband with negative results.

2. **<u>July 3, 2014 Controlled Buy (Drugs) (Vidal)</u>**

26. On July 3, 2014, CS-1 conducted a controlled methamphetamine buy with **Vidal** at **A-5**.

27. Prior to the controlled buy, FBI personnel briefed CS-1 regarding the objectives of the operation and safety considerations. The CS-1 did not have weapons and/or contraband. CS-1 was provided with recording devices/transmitter and $1,600.00 in buy funds for the purchase of one ounce of methamphetamine and an assault rifle.

28. CS-1 departed on foot from the transport vehicle to A-5, while under SSTF surveillance.

29. CS-1 did not purchase a weapon during the controlled buy. During the controlled methamphetamine buy. **Vidal** showed CS-1 half a kilogram of cocaine. **Vidal** stated that a kilogram was $18,600. CS-1 asked how much the half a kilogram was and **Vidal** said $9,300. **Vidal** further stated that he did not have any weapons for sale at that time, but that he would have a shipment of weapons the following Saturday. CS-1 purchased one ounce of methamphetamine.

30. CS-1 departed on foot from A-5 to the transport vehicle, while under SSTF surveillance.

31. At the staging area, the recording devices/transmitter, one ounce of methamphetamine and $1,100.00 cash were recovered. CS-1 exchanged $500 for the methamphetamine. A subsequent "Nartec" field test of the suspected methamphetamine yielded a positive result for the presence of methamphetamine.

32. CS-1's person was searched for weapons and/or contraband with negative results.

33. The DEA's Western Regional Laboratory later tested the substance purchased from **Vidal** on November 25, 2014. The analysis indicated that the substance contained 26.2 grams +/- 1.0grams of methamphetamine (actual).

3. **July 29, 2014 Controlled Buy (Drugs) (Vidal)**

34. On July 29, 2014, CS-1 conducted a controlled methamphetamine buy with **Vidal** at A-5.

35. Prior to the controlled buy, FBI personnel briefed CS-1 regarding the objectives of the operation and safety considerations. CS-1 did not have weapons and/or contraband. CS-1 was provided with recording devices/transmitter and $2,800.00 in buy funds for the purchase of one quarter pound of methamphetamine and an assault rifle.

36. CS-1 departed on foot from the transport vehicle to A-5, while under FBI surveillance.

37. CS-1 did not purchase a weapon during the controlled buy. **Vidal** showed the CS-1 guns, but stated that guns were not for sale. CS-1 purchased one quarter pound of methamphetamine.

38. During the controlled drug buy, **Vidal** showed CS-1 a half kilogram of cocaine that he had for sale. He stated that the cocaine was not completely pure but that it was good. He stated that the cocaine belonged to his friend and that he was charging $12,000 for half a kilogram.

39. CS-1 departed on foot from **A-5** to the transport vehicle, while under FBI surveillance.

40. At the staging area, the recording devices/transmitter, one quarter pound of methamphetamine and $1,000.00 cash were recovered. CS-1 exchanged $1,800 for the methamphetamine. A subsequent "Nartec" field test of the suspected methamphetamine yielded a positive result for the presence of methamphetamine.

41. CS-1's person was searched for weapons and/or contraband with negative results.

42. The DEA's Western Regional Laboratory later tested the substance purchased from **Vidal** on November 25, 2014. The analysis indicated that the substance contained 105.8 grams +/- 3.9grams of methamphetamine (actual).

4. **August 20, 2014 Controlled Buy (Drugs, Gun) (Vidal, Baeza-Bravo)**

43. On August 20, 2014, CS-1 conducted a controlled methamphetamine and assault rifle buy with **Vidal** and **Baeza-Bravo** at **A-5**.

44. Prior to the controlled buy, FBI personnel briefed CS-1 regarding the objectives of the operation and safety considerations. The CS-1 did not have weapons and/or contraband. CS-1 was provided with recording devices/transmitter and $2,800.00 in buy funds for the purchase of one quarter pound of methamphetamine and one assault rifle.

45. CS-1 called **Vidal** to confirm that he was at **A-5** and to inform him that CS-1 was on his/her way.

46. CS-1 departed on foot from the transport vehicle to **A-5**, while under FBI surveillance.

47. CS-1 ended up purchasing one assault rifle and 3 ounces of methamphetamine. **Vidal** told CS-1 that the rifle had belonged to a Sinaloa cartel associate that was interested in disposing of the weapon. During the controlled purchase, **Baeza-Bravo** delivered the assault rifle to **Vidal** at A-5.

48. CS-1 departed on foot from **A-5** to the transport vehicle, while under SSTF surveillance.

49. At the staging area, the recording devices/transmitter, three ounces of methamphetamine, one assault rifle and $240.00 cash were recovered. CS-1 exchanged $2,560 for the methamphetamine and one assault rifle. A subsequent "Nartec" field test of the suspected methamphetamine yielded a positive result for the presence of methamphetamine.

50. CS-1's person was searched for weapons and/or contraband with negative results.

51. The DEA's Western Regional Laboratory later tested the substance purchased from **Vidal** on November 25, 2014. The analysis indicated that the substance contained 78.1 grams +/- 2.9grams of methamphetamine (actual).

5. **<u>October 8, 2014 Controlled Buy (Drugs, Guns) (Vidal, Baeza-Bravo)</u>**

52. On October 8, 2014, CS-1 and UC-1, conducted a controlled methamphetamine and assault rifle buy with **Vidal** and **Baeza-Bravo** at **A-5**.

53. Prior to the controlled buy, FBI personnel briefed CS-1 and UC-1 regarding the objectives of the operation and safety considerations. CS-1 did not have weapons and/or contraband. CS-1 and UC-1 were provided with recording devices/transmitter and $4,800.00 in buy funds for the purchase of one quarter pound of methamphetamine and cocaine. **Vidal** was unable to contact his connect for the cocaine and was therefore unable to sell the cocaine. UC-1 and CS-1 purchased two assault rifles in lieu of the cocaine and they purchased one quarter pound of methamphetamine.

54. CS-1 was driven in an undercover vehicle by UC-1 to the controlled buy location while under visual observation by the FBI.

55. A silver BMW arrived in front of **A-5**. CS-1 and UC-1 walked towards the silver BMW. They made contact with **Baeza-Bravo**. **Baeza-Bravo** then departed southbound on Martin Luther King Boulevard.

56. CS-1 and UC-1 made contact with **Vidal** outside of A-5 and then walked into the A-5 together

57. Upon arrival of the CS-1 and UC-1, **Vidal** did not have the methamphetamine in his possession. **Vidal** stated that they would have to wait for a delivery. During that time, **Vidal** showed CS-1 and UC-1 three assault rifles. CS-1 exchanged $2,400 for two assault rifles. One assault rifle was identified as stolen from a federal firearms dealer in Fernley, Nevada. Later that evening, in the presence of CS-1 and UC-1, **Baeza-Bravo** delivered one quarter pound of methamphetamine to **Vidal** at **A-5**.

58. CS-1 and UC-1 departed the controlled buy location, in the undercover vehicle, while under visual observation by the FBI and returned to the transport vehicle.

59. CS-1 and UC-1 purchased two assault rifles for $1,200.00 each, totaling $2,400.00. CS-1 and UC-1 purchased one quarter pound of methamphetamine for $1,800.00.

60. At the staging area, the recording devices/transmitter, two assault rifles, one quarter pound of methamphetamine and $600 cash were recovered. A subsequent "Nartec" field test of the suspected methamphetamine yielded a positive result for the presence of methamphetamine.

61. CS-1's person was searched for weapons and/or contraband with negative results.

62. The DEA's Western Regional Laboratory later tested the substance purchased from **Vidal** on November 25, 2014. The analysis indicated that the substance contained 109.7 grams +/- 4.1grams of methamphetamine (actual).

### 6. December 18, 2014 Controlled Buy (Drugs) (Vidal)

63. On December 18, 2014, CS-1 conducted a controlled methamphetamine buy with **Vidal,** at **A-5**.

64. Prior to the controlled buy, FBI personnel briefed CS-1 regarding the objectives of the operation and safety considerations. CS-1 did not have weapons and/or contraband. CS-1 was provided with recording devices/transmitter and $4,800.00 in buy funds for the purchase of one quarter pound of methamphetamine and cocaine.

65. CS-1 departed on foot from the transport vehicle to A-5, while under FBI surveillance. CS-1 called **Vidal** to inform him that he/she had arrived. **Vidal** did not answer. CS-1 returned to the transport vehicle while under FBI surveillance. CS-1 called **Vidal** again to find out why he was unavailable. **Vidal** answered and told CS-1 that he would not be available until 1:00PM.

66. Surveillance teams observed two different vehicles—one black Mercedes and one black BMW—arrive at **A-5**.

67. CS-1 departed on foot from the transport vehicle to **A-5**, while under FBI surveillance.

68. CS-1 arrived at A-5. While the CS-1 was walking up to the residence the black BMW was leaving. CS-1 stated that there were two unknown Hispanic male adults in the car. CS-1 believed that **Baeza-Bravo** was driving the vehicle. CS-1 stated **Vidal** told him/her that **Baeza-Bravo** was in the car.

69. Another Hispanic Male Adult ("HMA") was present at the controlled drug buy. CS-1 was going to purchase one quarter pound of methamphetamine from **Vidal** and one quarter pound of cocaine from the HMA. The HMA did not have the cocaine during the meet. The HMA then told the CS-1 that he was expecting a shipment of cocaine. CS-1 only purchased one quarter pound of methamphetamine from **Vidal** during that meet.

70. CS-1 departed on foot from A-5 to the transport vehicle, while under FBI surveillance.

71. At the staging area, the recording devices/transmitter, one quarter pound of methamphetamine and $3,000.00 cash were recovered. CS-1 exchanged $1,800 for the methamphetamine. A subsequent "Nartec" field test of the suspected methamphetamine yielded a positive result for the presence of methamphetamine.

72. CS-1's person was searched for weapons and/or contraband with negative results.

73. The FBI submitted the one quarter pound of methamphetamine to the DEA's Western Regional Laboratory; however, the results of the analysis have not been received as of the date of this Affidavit.

7. **April 16, 2015 Controlled Buy (Drugs) (Baeza-Bravo)**

74. On April 16, 2015, CS-1 conducted a controlled methamphetamine buy with **Baeza-Bravo** in front of ARCO gas station, 3501 Northgate Blvd., Sacramento, California.

75. Prior to the controlled buy, FBI personnel briefed CS-1 regarding the objectives of the operation and safety considerations. CS-1 did not have weapons and/or contraband. CS-1 was provided with recording devices/transmitter and $2,000.00 in buy funds for the purchase of one quarter pound of methamphetamine.

76. Prior to the controlled drug buy, the CS-1 made several consensually monitored telephone calls to **Baeza-Bravo** to coordinate the deal for one quarter pound of methamphetamine. **Baeza-Bravo** indicated that he was going to meet his source of supply at **A-3** and asked CS-1 to meet him there. CS-1 declined and coordinated to meet him at the Arco gas station, 3501 Northgate Blvd., Sacramento, California.

77. While under FBI surveillance, CS-1 departed on foot from the transport vehicle to Arco gas station, 3501 Northgate Blvd., Sacramento, California.

78. The surveillance team observed **Baeza-Bravo** at **A-3**. It appeared as though he communicated with two individuals in the parking lot (possibly staff at the restaurant) and sat in two different vehicles. One of the vehicles had been parked at **A-3** and the other vehicle arrived while **Baeza-Bravo** was in the parking lot of **A-3**.

79. The surveillance units observed **Baeza-Bravo** depart **A-3** and arrive at Arco gas station, at 3501 Northgate Blvd., Sacramento, California. When **Baeza-Bravo** arrived, CS-1 got inside **Baeza-Bravo's** vehicle, where they conducted the controlled drug buy.

80. CS-1 departed the controlled buy location, on foot, while under visual observation by the FBI and returned to the transport vehicle.

81. At the staging area, the recording devices/transmitter, one quarter pound of methamphetamine and $400.00 cash were recovered. CS-1 exchanged $1,600 for the methamphetamine. A subsequent "Nartec" field test of the suspected methamphetamine yielded a positive result for the presence of methamphetamine.

82. CS-1's person was searched for weapons and/or contraband with negative results.

83. The FBI submitted the one quarter pound of methamphetamine to the DEA's Western Regional Laboratory; however, the results of the analysis have not been received as of the date of this Affidavit.

8. **April 20, 2015 Controlled Buy (Gun) (Baeza-Bravo; Gonzalez)**

84. On April 20, 2015, CS-1 conducted a controlled assault rifle buy with **Baeza-Bravo** in front of ARCO gas station, at 3501 Northgate Blvd., Sacramento, California.

85. Prior to the controlled buy, FBI personnel briefed CS-1 regarding the objectives of the operation and safety considerations. CS-1 did not have weapons and/or contraband. CS-1 was provided with recording devices/transmitter and $2,000.00 in buy funds for the purchase of one assault rifle and magazine drum.

86. Prior to the controlled gun buy, the CS-1 communicated with **Baeza-Bravo** via cellular telephone and text messages. CS-1 suggested to **Baeza-Bravo** to meet at the ARCO-AM/PM located at 4747 Northgate Blvd, Sacramento, California.

87. The surveillance team then observed **Baeza-Bravo** depart from the vicinity of **A-6**.

88. The surveillance team observed **Baeza-Bravo** go to the vicinity of 430 Harding Avenue, Sacramento, California and pick up **Gonzalez**. They arrived at **A-3**. **Gonzalez** exited the vehicle and went toward the rear door of the restaurant. **Gonzalez** then departed the back of the restaurant and returned to **Baeza-Bravo's** vehicle carrying a black bag over his shoulder.

89. **Baeza-Bravo** and **Gonzalez** then departed **A-3** and arrived at Arco gas station, at 3501 Northgate Blvd., Sacramento, California.

90. While under FBI surveillance, CS-1 departed on foot from the transport vehicle to Arco gas station, at 3501 Northgate Blvd., Sacramento, California. CS-1 got into **Baeza-Bravo's** vehicle. **Gonzalez** got out of the vehicle and retrieved a black bag from the trunk of the vehicle. He took the black bag with himself and got back into the front seat.

91. **Gonzalez** explained the characteristics of the gun to CS-1. **Gonzalez** stated that the gun could be set for fully-automatic or semi-automatic and showed CS-1 how the setup is done.[5] CS-1 asked them if they have more guns. **Gonzalez** stated that they did not have more guns at that time, but **Baeza-Bravo** stated that he could get more.

92. CS-1 departed the controlled buy location, on foot, while under visual observation by the FBI and returned to the transport vehicle.

93. At the staging area, the recording devices/transmitter, one assault rifle and magazine drum and $100.00 cash were recovered. CS-1 exchanged $1,900 for the assault rifle and magazine drum.

94. CS-1's person was searched for weapons and/or contraband with negative results.

---

[5] The assault rifle has been sent to the FBI Laboratory for function analysis.

9. **May 12, 2015 Controlled Buy (Drugs) (Baeza-Bravo; Gonzalez)**

95. On May 12, 2015, CS-1 conducted a controlled methamphetamine buy with **Baeza-Bravo** in front of Napa Auto Parts Store, 4635 Northgate Blvd., Sacramento, California.

96. Prior to the controlled buy, FBI personnel briefed CS-1 regarding the objectives of the operation and safety considerations. CS-1 did not have weapons and/or contraband. CS-1 was provided with recording devices/transmitter and $2,000.00 in buy funds for the purchase of one quarter pound of methamphetamine.

97. The surveillance team identified a white Toyota Camry in the vicinity of A-6 which had been driven by **Baeza-Bravo** to two previous narcotics and weapons buys on April 16, 2015 and April 20, 2015 respectively.

98. CS-1 placed a consensually monitored telephone call to **Baeza-Bravo** to coordinate for the sale of one quarter pound of methamphetamine in the presence of agents. Based on Pen Register information, **Baeza-Bravo** made a telephone call to **Gonzalez**.

99. Surveillance teams observed a Hispanic male believed to be **Gonzalez** arrive at **A-3**. This man was driving a gold 1998 Mercury Grand Marquis bearing California license plate 4CKZ644 and registered in the name of **Gonzalez**. **Gonzalez** opened the back door of **A-3**, which was closed for business at the time, and accepted delivery of boxes. Surveillance teams then observed **Gonzalez** depart **A-3** and then return within minutes.

100. The surveillance team then observed **Baeza-Bravo** depart the vicinity of **A-6**.

101. The surveillance team observed **Baeza-Bravo** go to Chase Bank followed by 430 Harding Avenue, Sacramento, California, which is an address believed to be **Gonzalez'** previous residence. The surveillance team observed **Baeza-Bravo** depart the residence carrying a small white bag.

102. While under FBI surveillance, CS-1 departed on foot from the transport vehicle to the Napa Auto Parts Store, 4635 Northgate Blvd., Sacramento, California.

103. After the controlled methamphetamine transaction, CS-1 departed the controlled buy location, on foot, while under visual observation by the FBI and returned to the transport vehicle.

104. At the staging area, the recording devices/transmitter, one quarter pound of methamphetamine and $450.00 cash were recovered. CS-1 exchanged $1,550 for the methamphetamine. A subsequent "Nartec" field test of the suspected methamphetamine yielded a positive result for the presence of methamphetamine.

105. CS-1's person was searched for weapons and/or contraband with negative results.

106. The FBI submitted the one quarter pound of methamphetamine to the DEA's Western Regional Laboratory; however, the results of the analysis have not been received as of the date of this Affidavit.

10. **May 21, 2015 Controlled Buy (Gun) (Baeza-Bravo)**

107. On May 21, 2015, CS-1 and UC-1 conducted a controlled assault rifle buy with **Baeza-Bravo**, in front of Los Tres Potrillos Western Wear, 2706 Northgate Boulevard, Sacramento, California.

108. Prior to the controlled buy, FBI personnel briefed CS-1 and UC-1 regarding the objectives of the operation and safety considerations. CS-1 did not have weapons and/or contraband. CS-1 and UC-1 were provided with recording devices/transmitter and $8,000.00 in buy funds for the purchase of one pound of methamphetamine and gun(s).

109. CS-1 began placing consensually monitored telephone calls/texts to **Baeza-Bravo** in the presence of agents. CS-1 stated that he/she was interested in getting one pound of methamphetamine and gun(s). CS-1 made contact with **Baeza-Bravo** and **Baeza-Bravo** stated that he would make calls and get back to CS-1. **Baeza-Bravo** was able to set up a controlled gun buy, but was unable to set up a controlled drug buy.

110. Prior to meeting with CS-1 and UC-1, **Baeza-Bravo** was observed by surveillance teams going to **A-3**. CS-1 had a conversation with **Baeza-Bravo** and **Baeza-Bravo** first requested to meet at Los Tres Potrillos Western Wear. **Baeza-Bravo** then changed the location to La Piedad restaurant (La Piedad restaurant was located in the same strip mall as Los Tres Potrillos Western Wear).

111. **Baeza-Bravo** arrived at Los Tres Potrillos Western Wear. Shortly thereafter, CS-1 was driven in an undercover vehicle by UC-1 to the controlled buy location while under visual observation by the FBI.

112. **Baeza-Bravo**, CS-1 and UC-1 went inside La Piedad Restaurant and approximately 50 minutes later, they departed and went to Los Tres Potrillos Western Wear.

113. A blue Mustang arrived in front of Los Tres Potrillos Western Wear. The driver of the vehicle made contact with the CS-1 and UC-1. CS-1 and UC-1 retrieved a bag from the back of the blue Mustang and took it to **Baeza-Bravo**'s vehicle. Payment for the assault rifle was made to **Baeza-Bravo.**

114. CS-1 and UC-1 departed the controlled buy location, in the undercover vehicle, while under visual observation by the FBI and returned to the transport vehicle.

115. Surveillance teams observed **Baeza-Bravo** parking at his residence, located at 1655 Scarlett Ash Ave., Sacramento, California (**A-6**).

116. At the staging area, the recording devices/transmitter, one assault rifle, magazine, optic and silencer and $6,000 cash were recovered. CS-1 and UC-1 exchanged $2,000 for the one assault rifle, magazine, optic and silencer.

117. CS-1's person was searched for weapons and/or contraband with negative results.

11. **May 28, 2015 Controlled Buy (Drugs) (Gonzalez)**

118. On May 28, 2015, CS-1 and UC-1 conducted a controlled methamphetamine buy with **Gonzalez** at Mariscos El Camaron Restaurant, 3134 Northgate Blvd., Sacramento, California (**A-3**).

119. Prior to the controlled buy, FBI personnel briefed CS-1 and UC-1 regarding the objectives of the operation and safety considerations. CS-1 did not have weapons and/or contraband. CS-1 and UC-1 were provided with recording devices/transmitter and $6,000.00 in buy funds for the purchase of one pound of methamphetamine.

120. CS-1 was driven in an undercover vehicle by UC-1 to the controlled buy location while under visual observation by the FBI.

121. CS-1 asked **Gonzalez** if he remembered CS-1. **Gonzalez** stated that he did remember CS-1. He stated that he had previously sold CS-1 "a toy" (likely referring to the assault rifle sold during the controlled gun buy on April 20, 2015 with **Baeza-Bravo**). CS-1 and UC-1 discussed future gun transactions with **Gonzalez. Gonzalez** provided CS-1 and UC-1 his telephone number. CS-1 and UC-1 asked **Gonzalez** if he was aware of anyone in the area that has "glass" (referring to methamphetamine). **Gonzalez** stated that he could get them methamphetamine in any quantity. UC-1 asked how soon they could get a pound of methamphetamine. **Gonzalez** stated that he had the pound available. **Gonzalez** requested $4,400 for one pound of methamphetamine. CS-1, UC-1 and **Gonzalez** conducted the transaction in the UC-1's vehicle.

122. CS-1 and UC-1 departed the controlled buy location, in the undercover vehicle, while under visual observation by the FBI and returned to the transport vehicle.

123. At the staging area, the recording device/transmitter, the suspected methamphetamine and $1,600 cash were recovered. CS-1 and UC-1 exchanged $4,400 for the suspected methamphetamine. A subsequent "Nartec" field test of the suspected methamphetamine yielded a positive result for the presence of methamphetamine.

124. CS-1's person was searched for weapons and/or contraband with negative results.

125. The FBI submitted the one pound of methamphetamine to the DEA's Western Regional Laboratory; however, the results of the analysis have not been received as of the date of this Affidavit.

12. **June 3, 2015 Controlled Buy (Drugs) (Gonzalez)**

126. On June 3, 2015, CS-1 and UC-1 conducted a controlled methamphetamine buy with **Gonzalez** at Mariscos El Camaron Restaurant, 3134 Northgate Blvd., Sacramento, California (**A-3**).

127. Prior to the controlled buy, FBI personnel briefed CS-1 and UC-1 regarding the objectives of the operation and safety considerations. The CS-1 did not have weapons and/or contraband. CS-1 and UC-1 were provided with recording devices/transmitter and $5,000.00 in buy funds for the purchase of one pound of methamphetamine.

128. CS-1 was driven in an undercover vehicle by UC-1 to the controlled buy location while under visual observation by the FBI.

129. UC-1 placed a telephone call to **Gonzalez**. UC-1 stated that he/she wanted the same thing as the week before (referring to controlled methamphetamine buy on May 28, 2015). **Gonzalez** stated "you got it." UC-1 stated that he/she would be stopping by A-3 at approximately 1:00 PM. **Gonzalez** stated that 1:00 PM would be good. At approximately 2:00 PM, CS-1 and UC-1 conducted a controlled meeting with **Gonzalez** at A-3. CS-1 and UC-1 walked into A-3 and made contact with **Gonzalez. Gonzalez** told the CS-1 and UC-1 that he had their "tacos" ready. **Gonzalez** gave CS-1 and UC-1 a to-go bag, with a white Styrofoam container in it, containing one pound of methamphetamine. During that controlled drug buy, UC-1 placed an order for two assault rifles.

130. CS-1 and UC-1 departed the controlled buy location, in the undercover vehicle, while under visual observation by the FBI and returned to the transport vehicle.

131. At the staging area, the recording device/transmitter, the suspected methamphetamine and $600 cash were recovered. UC-1 exchanged $4,400 for the suspected methamphetamine. A subsequent "Nartec" field test of the suspected methamphetamine yielded a positive result for the presence of methamphetamine.

132. CS-1's person was searched for weapons and/or contraband with negative results.

133. The FBI submitted the one pound of methamphetamine to the DEA's Western Regional Laboratory; however, the results of the analysis have not been received as of the date of this Affidavit.

13. **June 30, 2015 Controlled Buy (Gun) (Gonzalez)**

134. On June 30, 2015, CS-1 conducted a controlled assault rifle buy with **Gonzalez** at Mariscos El Camaron Restaurant, 3134 Northgate Blvd., Sacramento, California (**A-3**).

135. Prior to the controlled buy, FBI personnel briefed CS-1 regarding the objectives of the operation and safety considerations. CS-1 did not have weapons and/or contraband. CS-1 was provided with recording devices/transmitter and $4,000.00 in buy funds for the purchase of one assault rifle.

136. CS-1 was driven in an undercover vehicle by UC-2 to the controlled buy location while under visual observation by the FBI.

137. CS-1 communicated with **Gonzalez** via telephone to coordinate picking up the assault rifles that were ordered by UC-1 (during controlled drug buy on June 3, 2015). During the call between CS-1 and **Gonzalez, Gonzalez** asked if CS-1 was coming. CS-1 asked **Gonzalez**, "Are they all ready?" **Gonzalez** responded in Spanish and English, "Let me see. Only one. But let me double check right now." **Gonzalez** reached out to CS-1, via text message, and stated, "One is ready the other till next wk. They dnt have an exact wk. Anyways i was hoping 4 u pick it up. I got 2 much at risk."

138. CS-1 conducted a controlled gun buy for one assault rifle at **A-3**. **Gonzalez** stated that he did not have the second assault rifle at that time.

139. CS-1 departed the controlled buy location, in the undercover vehicle, while under visual observation by the FBI and returned to the transport vehicle.

140. At the staging area, the recording device/transmitter, $2,100 cash, one assault rifle and magazine drum were recovered. CS-1 exchanged $1,900 for the assault rifle and magazine.

141. CS-1's person was searched for weapons and/or contraband with negative results.

### 14. July 17, 2015 Controlled Buy (Drugs, Gun) (Gonzalez)

142. On July 17, 2015, CS-1 conducted a controlled methamphetamine and assault rifle buy with **Gonzalez** at Mariscos El Camaron Restaurant, 3134 Northgate Blvd., Sacramento, California (**A-3**).

143. Prior to the controlled buy, FBI personnel briefed CS-1 regarding the objectives of the operation and safety considerations. CS-1 did not have weapons and/or contraband. CS-1 was provided with recording devices/transmitter and $6,600.00 in buy funds for the purchase of one assault rifle and one pound of methamphetamine.

144. CS-1 was driven in an undercover vehicle by UC-2 to the controlled buy location while under visual observation by the FBI.

145. CS-1 communicated with **Gonzalez** via text message to facilitate picking up a second assault rifle that UC-1 had ordered (during controlled drug buy on June 3, 2015). **Gonzalez** texted CS-1 that he had "the toy." **Gonzalez** and CS-1 communicated telephonically to facilitate a gun and drug deal. CS-1 placed an order for the assault rifle and one pound of methamphetamine.

146. CS-1 conducted a controlled buy for one assault rifle and one magazine drum and one pound of methamphetamine at **A-3**.

147. CS-1 departed the controlled buy location, in the undercover vehicle, while under visual observation by the FBI and returned to the transport vehicle.

148. At the staging area, the recording device/transmitter, one assault rifle, one magazine drum, and the suspected methamphetamine were recovered. CS-1 exchanged $2,200 for the assault rifle and magazines and $4,400 for the suspected methamphetamine. A subsequent "Nartec" field test of the suspected methamphetamine yielded a positive result for the presence of methamphetamine.

149. CS-1's person was searched for weapons and/or contraband with negative results.

150. The FBI submitted the one pound of methamphetamine to the DEA's Western Regional Laboratory; however, the results of the analysis have not been received as of the date of this Affidavit.

### 15. August 12, 2015 Controlled Buy (Drugs) (Gonzalez)

151. On August 12, 2015, CS-1 conducted a controlled methamphetamine buy with **Gonzalez** at Mariscos El Camaron Restaurant, 3134 Northgate Blvd., Sacramento, California (**A-3**).

152. Prior to the controlled buy, FBI personnel briefed CS-1 regarding the objectives of the operation and safety considerations. CS-1 did not have weapons and/or contraband. CS-1 was provided with recording devices/transmitter and $4,500.00 in buy funds for the purchase of one pound of methamphetamine.

153. CS-1 was driven in an undercover vehicle by UC-2 to the controlled buy location while under visual observation by the FBI.

154. CS-1 did not contact **Gonzalez** on the day of the controlled drug buy to facilitate the buy for one pound of methamphetamine. CS-1 walked into **A-3** unannounced and conducted a controlled buy for one half pound of methamphetamine. **Gonzalez** only had one half pound available at that time.

155. CS-1 departed the controlled buy location, in the undercover vehicle, while under visual observation by the FBI and returned to the transport vehicle.

156. At the staging area, the recording device/transmitter, the suspected methamphetamine and $2,400 cash were recovered. CS-1 exchanged $2,100 for the suspected methamphetamine. A subsequent "Nartec" field test of the suspected methamphetamine yielded a positive result for the presence of methamphetamine.

157. CS-1's person was searched for weapons and/or contraband with negative results.

158. The FBI submitted the half pound of methamphetamine to the DEA's Western Regional Laboratory; however, the results of the analysis have not been received as of the date of this Affidavit.

16. **<u>September 2, 2015 Controlled Buy (Drugs) (Gonzalez)</u>**

159. On September 2, 2015, CS-1 conducted a controlled methamphetamine buy with **Gonzalez** at Mariscos El Camaron Restaurant, 3134 Northgate Blvd., Sacramento, California (**A-3**).

160. Prior to the controlled buy, FBI personnel briefed CS-1 regarding the objectives of the operation and safety considerations. CS-1 did not have weapons and/or contraband. CS-1 was provided with recording devices/transmitter and $4,500.00 in buy funds for the purchase of one pound of methamphetamine.

161. CS-1 was driven in an undercover vehicle by UC-2 to the controlled buy location while under visual observation by the FBI.

162. CS-1 stated that **Gonzalez** appeared to be in a hurry. CS-1 placed the money on top of a box of aprons and offered to take the box into the dry food storage room. **Gonzalez** grabbed the money off of the box. CS-1 stated that **Gonzalez** finished boxing up the methamphetamine in a to-go food container and bag and handed it to CS-1.

163. CS-1 departed the controlled buy location, in the undercover vehicle, while under visual observation by the FBI and returned to the transport vehicle.

164. At the staging area, the recording device/transmitter, the suspected methamphetamine and $100 cash were recovered. CS-1 exchanged $4,400 for the suspected methamphetamine. A subsequent "Nartec" field test of the suspected methamphetamine yielded a positive result for the presence of methamphetamine.

165. CS-1's person was searched for weapons and/or contraband with negative results.

166. The FBI submitted the one pound of methamphetamine to the DEA's Western Regional Laboratory; however, the results of the analysis have not been received as of the date of this Affidavit.

17. **September 16, 2015 Recorded Conversation (Gun) (Gonzalez, McCurin)**

167. On September 16, 2015, surveillance teams were in the vicinity of **A-3**. **McCurin** identified two different surveillance vehicles and approached the vehicles. **McCurin** confronted the law enforcement personnel and took pictures of them as well as their vehicles.

168. Later that day, on September 16, 2015, during court-authorized wiretap interception of **Gonzalez'** telephone, **McCurin** called **Gonzalez** and asked **Gonzalez** where he was. **McCurin** asked **Gonzalez** if he had seen an old man in an F-150 and another "dude" in a black truck in the parking lot. **McCurin** said that they saw him and took off. **McCurin** stated that there was some "funny ass shit going on." **McCurin** asked **Gonzalez** what time he closed (likely referring to **A-3**). **Gonzalez** responded five or six o'clock. **McCurin** told **Gonzalez** that he wanted to give him a box. He said he had some clips and some "other shit" in it. **McCurin** also said that he had a pistol in it that he needed **Gonzalez** to hold for a couple of hours until his boy got home. **Gonzalez** said, "sure, no problem."

18. **September 16, 2015 Recorded Conversation (Drugs) (Gonzalez, Hernandez)**

169. On September 16, 2015, **Gonzalez** called **Hernandez** and asked if he had **Gonzalez's** money. **Hernandez** laughed and said that it should be the other way around. **Gonzalez** told **Hernandez** to give him what was left over in the corner of his house. **Hernandez** asked **Gonzalez** if he wanted it. **Gonzalez** said yes. **Gonzalez** asked how much it was for the stuff that was left over. **Hernandez** stated that he could check and let **Gonzalez** know. **Gonzalez** asked that if it was a quarter how much would he would want for it. **Hernandez** told **Gonzalez** to figure it out. **Gonzalez** responded with seven fifty. **Hernandez** said eight fifty. **Gonzalez** told **Hernandez** that he won't get rid of it. **Hernandez** stated that he would and that **Gonzalez** was taking advantage of him. **Gonzalez** stated that as soon as he gets it, he will give **Hernandez** "papers" for it.[6] **Hernandez** said that as soon as he gets out he will head over to **Gonzalez**.

19. **September 18, 2015 Controlled Buy (Drugs, Gun) (Gonzalez)**

170. On September 18, 2015, CS-1 conducted a controlled methamphetamine and one assault rifle buy with **Gonzalez** at Mariscos El Camaron Restaurant, 3134 Northgate Blvd., Sacramento, California (**A-3**).

171. On September 17, 2015, during the interception of **Gonzalez'** telephone on an authorized wiretap interception, CS-1 called **Gonzalez** and placed an order for

[6] Based on my familiarity with the code terms that were used in this investigation, I believe that when **Hernandez** used the term "papers" he was referring to heroin.

"stuff[7]" and also for a "toy[8]." **Gonzalez** agreed. CS-1 stated that he/she would pick it up on the following day.

172. On September 18, 2015, prior to the controlled buy, FBI personnel briefed CS-1 regarding the objectives of the operation and safety considerations. The CS-1 did not have weapons and/or contraband. The CS-1 was provided with recording devices/transmitter and $6,600.00 in buy funds for the purchase of one assault rifle and one pound of methamphetamine.

173. CS-1 was driven in an undercover vehicle by UC-2 to the controlled buy location while under visual observation by the FBI.

174. After the controlled buy transaction, CS-1 departed the controlled buy location, in the undercover vehicle, while under visual observation by the FBI and returned to the transport vehicle.

175. At the staging area, the recording device/transmitter, one assault rifle, two assault rifle magazines, and the suspected methamphetamine were recovered. CS-1 exchanged $2,200 for the assault rifle and magazines and $4,400 for the suspected methamphetamine. A subsequent "Nartec" field test of the suspected methamphetamine yielded a positive result for the presence of methamphetamine.

176. CS-1's person was searched for weapons and/or contraband with negative results.

177. The FBI submitted the one pound of methamphetamine to the DEA's Western Regional Laboratory; however, the results of the analysis have not been received as of the date of this Affidavit.

20. **<u>September 19, 2015 Recorded Conversation (Guns) (Gonzalez, McCurin)</u>**

178. On September 19, 2015, during an authorized wiretap interception of **Gonzalez's** telephone, CS-1 called **Gonzalez** and stated that the assault rifle was not working right and that CS-1 wanted to bring it back or return it. **Gonzalez** stated that CS-1 should bring it to him, as it should be working right. CS-1 asked **Gonzalez** to call his people and tell them that it wasn't working and to call CS-1 back right away. Immediately after the telephone call with CS-1, **Gonzalez** called **Christopher McCurin**, hereinafter **McCurin**. **Gonzalez** told **McCurin** that he was calling regarding one of the "long ones" that he'd bought from **McCurin**. **Gonzalez** said that he had gotten rid of it, but that CS-1 said it wasn't working. **McCurin** asked which one he was referring to. **Gonzalez** said that it was the "long one." **McCurin** asked if he had sold **Gonzalez** a long one and **Gonzalez** responded that **McCurin** was the only one he was buying from. **McCurin** suggested that CS-1 bring it back so he could swap it out. **McCurin** stated that he had three more "ready."

179. On September 19, 2015, later in the day, **McCurin** contacted **Gonzalez** and asked if he "got that thing back." **Gonzalez** stated that the guy never called back.

[7] Based on my familiarity with the code terms that were used in this investigation, I believe that when CS-1 used the term "stuff" **Gonzalez** understood it to reference methamphetamine.

[8] Based on my familiarity with the code terms that were used in this investigation, I believe that when CS-1 used the term "toy" **Gonzalez** understood it to reference a gun.

**McCurin** said that maybe the person fixed it. He also said that if they still have a problem to give it back to **McCurin** so he could have it fixed.

21. **September 24, 2015 Recorded Conversation (Guns) (Gonzalez, McCurin)**

180. **McCurin** called **Gonzalez** and asked **Gonzalez**, "If someone wants one of those A-R's with the 100 round drum,[9] they are going to go up a little bit, like damn near two racks."[10] **Gonzalez** asked how much **McCurin** wanted for it. **McCurin** replied "two racks…with 100, fully." **Gonzalez** asked, "two racks?" **McCurin** responded, "yeah, because he - he it's more for him to ship those 100 rounders to that dude." He said that it could go down depending on how many they buy. **Gonzalez** asked which one was the one with the drum. **McCurin** stated, "The drums for the A-R's not A-K's." **Gonzalez** asked if they come short or long. **McCurin** stated that they can come short or long. **Gonzalez** told **McCurin** that he would get back to him.

22. **September 29, 2015 Recorded Conversation (Guns) (Gonzalez, McCurin)**

181. **McCurin** sent a text message to **Gonzalez** stating, "Call me please."

182. **Gonzalez** called **McCurin**. **McCurin** told **Gonzalez** that he has one of those things that he wants **Gonzalez** to sell for him. **Gonzalez** asked if it was a "toy." **McCurin** agreed. **Gonzalez** asked **McCurin** if he was at home. **McCurin** stated that he also has a little one he is thinking about selling. He said it was a little 38[11] that kind of looked like a snub nose five shot.[12] **Gonzalez** told **McCurin** that he would be right there. Approximately 40 minutes later, **McCurin** called **Gonzalez** and **Gonzalez** told **McCurin** that he was about to pull up.

23. **October 7, 2015 Controlled Buy (Drugs) (Gonzalez, Hernandez)**

183. On October 7, 2015, CS-1 conducted a controlled heroin buy with **Gonzalez** and **Hernandez** at Mariscos El Camaron Restaurant, 3134 Northgate Blvd., Sacramento, California (**A-3**).

184. Prior to the controlled buy, FBI personnel briefed CS-1 regarding the objectives of the operation and safety considerations. The CS-1 did not have weapons and/or contraband. The CS-1 was provided with recording devices/transmitter and $9,500.00 in buy funds for the purchase of one quarter pound of heroin.

---

[9] Based on my familiarity with the code terms that were used in this investigation, I believe that when McCurin used the term "100 round drum" he was referring to a 100 round magazine for an AR assault rifle.

[10] Based on my familiarity with the code terms that were used in this investigation, I believe that when McCurin used the term "two racks" he was referring to $2,000.

[11] Based on my familiarity with the code terms that were used in this investigation, I believe that when McCurin used the term "38" he was referring to the caliber of the gun.

[12] Based on my familiarity with the code terms that were used in this investigation, I believe that when McCurin used the term "snub nose five shot" he was stating that the gun looked like a five shot revolver.

185. CS-1 was driven in an undercover vehicle by UC-2 to the controlled buy location while under visual observation by the FBI.

186. CS-1 communicated with **Gonzalez**, telephonically, to set up the controlled buy. After CS-1 coordinated the controlled drug buy, **Gonzalez** contacted **Hernandez** to obtain the heroin for CS-1. The conversations between **Hernandez** and **Gonzalez** were captured over an authorized wiretap interception of **Gonzalez'** telephone. **Hernandez** asked **Gonzalez** if he was still going to want the "truck[13]." **Gonzalez** said that it may be too late, but that **Gonzalez** would call the guy and find out and verify. **Hernandez** said that a friend would lend it to **Hernandez**, but that he needed to return it within an hour. **Gonzalez** said that he would reach out to CS-1 and call **Hernandez** back. **Gonzalez** exchanged several telephone calls with **Hernandez**. **Gonzalez** and **Hernandez** were coordinating to meet, so that **Hernandez** could give **Gonzalez** the one half pound of heroin. **Hernandez** told **Gonzalez** that he had to wait for his friend to arrive. **Hernandez** said that the source of supply for heroin was coming from approximately one hour away. **Gonzalez** asked **Hernandez** to "take a piece out" (one ounce) of the heroin for **Gonzalez**. **Hernandez** agreed. At the direction of law enforcement, CS-1 placed a telephone call to **Gonzalez**. **Gonzalez** asked CS-1 if CS-1 still wanted it. CS-1 asked if they could meet at the restaurant that night. **Gonzalez** told CS-1 that it is 100% pure and that CS-1 needed to "mix that shit up," otherwise it could kill someone. CS-1 asked if it was "95."[14] **Gonzalez** agreed.

187. CS-1 arrived at the **A-3** prior to **Gonzalez**. Shortly thereafter, **Hernandez** arrived at **A-3**. CS-1, **Gonzalez** and **Hernandez** walked into **A-3**. They walked inside the bathroom. **Hernandez** placed two bags of heroin on the table. **Hernandez** then handed the smaller bag to **Gonzalez**. CS-1 asked **Hernandez** if he was providing CS-1 with half a pound of heroin. **Hernandez** responded that it was 8 ounces of heroin. **CS-1** paid **Gonzalez** $9,500 in exchange for the heroin.

188. CS-1 departed the controlled buy location, in the undercover vehicle, while under visual observation by the FBI and returned to the transport vehicle.

189. At the staging area, the recording device/transmitter and suspected heroin were recovered. CS-1 exchanged $9,500 for the heroin. A subsequent "Nartec" field test of the suspected heroin yielded a positive result for the presence of heroin.

190. CS-1's person was searched for weapons and/or contraband with negative results.

191. The FBI submitted the half pound of heroin to the DEA's Western Regional Laboratory; however, the results of the analysis have not been received as of the date of this Affidavit.

24. **October 13, 2015 Recorded Conversation (Guns) (Gonzalez, McCurin)**

192. **Gonzalez** and **McCurin** exchanged a series of text messages. **Gonzalez** states, "U have any of them big toys avl." **McCurin** responded, "How many" **McCurin** then sent another text message, "And there's on drum I might keep it." **McCurin**

[13] Based on my familiarity with the code terms that were used in this investigation, I believe that when Hernandez used the term "truck" he was referring to heroin.

[14] CS-1 paid $9,500 for one half pound of heroin.

followed up with another text message, "One drum not on i mess up my text." **Gonzalez** responded "2" and **McCurin** said, "Is it for sure."

193. A few minutes after the last text message from **McCurin, McCurin** called **Gonzalez. McCurin** told **Gonzalez** that it will take a couple of days for the person to put it together. **Gonzalez** asked **McCurin** if he had anything at that time. **McCurin** stated that they were bigger than ARs – AR10s and that the guy wants three racks. **McCurin** said that they were 308 shells[15] which are bigger than the 223 and the 555-60. **Gonzalez** stated, "damn." **McCurin** stated that if **Gonzalez** wanted them, **McCurin** will let the guy know and that he will have them ready in a couple of days. **Gonzalez** told **McCurin** that he will call him back.

### 25. December 17, 2015 Cocaine Sample Acquisition (Hernandez)

194. On December 17, 2015, CS-1, UC-1 and UC-3 conducted an undercover operation with **Hernandez** at RODRIGO's COMAL restaurant, 9584 Micron Avenue, Sacramento, California. The primary objective of the operation was to have the CS-1 and/or the UC's have what appeared to be a chance encounter with **Hernandez.**

195. Prior to the controlled undercover operation, FBI personnel briefed the CS-1, UC-1 and UC-3 regarding the objectives of the operation and safety considerations. CS-1 did not have weapons and/or contraband. CS-1 was provided with recording devices. UC-1 was provided with recording devices/transmitter.

196. CS-1, UC-1 and UC-3 arrived at the restaurant before **Hernandez**. Shortly after **Hernandez'** arrival, CS-1 approached **Hernandez** and stated that he/she thought they met at **A-3. Hernandez** remembered and agreed. They discussed the heroin that CS-1 previously purchased. CS-1 and **Hernandez** discussed conducting future drug transactions and prices of cocaine and methamphetamine. **Hernandez** provided CS-1 with a sample of cocaine wrapped in plastic. They exchanged telephone numbers for future contact.

197. At the staging area, the recording device/transmitter and suspected sample cocaine were recovered from CS-1 and UC-1. A subsequent "Nartec" field test of the suspected cocaine yielded a positive result for the presence of cocaine.

198. CS-1's person was searched for weapons and/or contraband with negative results.

199. The FBI submitted the sample of cocaine to the DEA's Western Regional Laboratory; however, the results of the analysis have not been received as of the date of this Affidavit.

### 26. December 22, 2015 Controlled Buy (Drugs) (Hernandez)

200. On December 22, 2015, CS-1 conducted a controlled cocaine buy with **Hernandez** at Thrifty Car Sales, 5710 Florin Road, Sacramento, California.[16]

---

[15] Based on my familiarity with the code terms that were used in this investigation, I believe that when McCurin used the term "308 shell" he was referring to the caliber of the ammunition for the AR 10 rifle.

[16] Based on my knowledge of the investigation, I believe that this is **Hernandez's** place of work.

201. Prior to the controlled buy, FBI personnel briefed CS-1 regarding the objectives of the operation and safety considerations. The CS-1 did not have weapons and/or contraband. The CS-1 was provided with recording devices/transmitter and $5,000.00 in buy funds for the purchase of either heroin or cocaine, depending on what **Hernandez** had available.

202. CS-1 departed, on foot, from the transport vehicle to the controlled buy location while under visual observation by the FBI.

203. **Hernandez** stated that he only had cocaine at that time and that **Hernandez** works in kilograms for cocaine and in pounds for methamphetamine. **Hernandez** tries not to break heroin.

204. **Hernandez** and the CS-1 walked to **Hernandez**'s vehicle (a white 1966 Volkswagen Beetle, bearing California license plate 7HVW496 and registered in the name of "Hernandez") (hereinafter "**V-1**"). CS-1 stated that **Hernandez** took a sample of cocaine out of his glove compartment and showed it to CS-1. CS-1 stated that the sample was probably about one half ounce. **Hernandez** put the sample back in his glove compartment.

205. CS-1 stated that he/she wanted to get $5,000.00 worth of cocaine. **Hernandez** stated that he needed to go get the cocaine, but that it was close by. CS-1 stated that he/she would wait for **Hernandez**.

206. **Hernandez** returned to Thrifty Car Sales with the cocaine. CS-1 stated that the cocaine was in **Hernandez**' lap in **V-1**. The cocaine was in a plastic bag. **Hernandez** wrapped the cocaine up in front of CS-1 and placed it in a plastic bag. CS-1 stated that he/she thought that **Hernandez** said he would give CS-1 156 grams of cocaine for $5,000.00.

207. After the controlled buy, **Hernandez** dropped CS-1 off in front of Wal-Mart. CS-1 got separation from **Hernandez** and was picked up by the transport vehicle.

208. Following the controlled drug buy, based on Precise Location Data obtained by a search warrant on **Hernandez's** cellular telephone, it appeared that **Hernandez** went to the vicinity of **A-1**.[17] Shortly thereafter, it appeared based on Precise Location Data that **Hernandez** returned to work.

209. At the staging area, the recording device/transmitter and suspected cocaine were recovered. CS-1 exchanged $5,000 for the cocaine. A subsequent "Nartec" field test of the suspected cocaine yielded a positive result for the presence of cocaine.

210. CS-1's person was searched for weapons and/or contraband with negative results.

211. The FBI submitted the 156 grams of cocaine to the DEA's Western Regional Laboratory; however, the results of the analysis have not been received as of the date of this Affidavit.

---

[17] Based on my training and experience, I believe that **Hernandez** went to his residence to drop off the money that was collected during the controlled drug buy.

27. **February 3, 2016 Controlled Buy (Drugs) (Hernandez)**

212. On February 3, 2016, a CS-1 conducted a controlled methamphetamine buy with **Hernandez** at Thrifty Car Sales, 5710 Florin Road, Sacramento, California.

213. Prior to the controlled buy, FBI personnel briefed CS-1 and UC-3 regarding the objectives of the operation and safety considerations. CS-1 did not have weapons and/or contraband. CS-1 was provided with recording devices/transmitter and $5,000.00 in buy funds for the purchase of one pound of methamphetamine.

214. CS-1 was driven in an undercover vehicle by UC-3 to the controlled buy location while under visual observation by the FBI.

215. CS-1 and UC-1 saw **Hernandez** arrive in a green Volkswagen Beetle. CS-1 approached **Hernandez**. CS-1 and **Hernandez** sat in **Hernandez'** vehicle. CS-1 sat in the passenger seat and **Hernandez** sat in the driver's seat. CS-1 stated that **Hernandez** took the methamphetamine out from underneath the driver's seat. CS-1 paid $4,000.00 for the methamphetamine. **Hernandez** stated that if the CS-1 would buy more, then **Hernandez** would charge $3,800.00 for one pound of methamphetamine. CS-1 stated that he/she would get one pound of methamphetamine at that time, so he/she could test it. **Hernandez** stated that the methamphetamine was good and that it had a stamp on it.[18]

216. CS-1 departed the controlled buy location, in the undercover vehicle, while under visual observation by the FBI and returned to the transport vehicle.

217. At the staging area, the recording device/transmitter, suspected methamphetamine and $1,000 in cash were recovered. CS-1 exchanged $4,000 for the methamphetamine. A subsequent "Nartec" field test of the suspected methamphetamine yielded a positive result for the presence of methamphetamine.

218. CS-1's person was searched for weapons and/or contraband with negative results.

219. The FBI submitted the one pound of methamphetamine to the DEA's Western Regional Laboratory; however, the results of the analysis have not been received as of the date of this Affidavit.

C. **Additional Investigation-related Intelligence and Surveillance**

1. **Identification of Targets**

a. **Hernandez, Gonzalez, Baeza-Bravo, and Vidal**

220. Various meetings that CS-1 had with **Hernandez, Gonzalez, Baeza-Bravo,** and **Vidal** were video-recorded. Various members of the FBI investigative team have viewed these recordings and have compared the persons depicted therein with the persons depicted in known photographs of **Hernandez, Gonzalez, Baeza-Bravo,** and **Vidal** obtained either from the California Department of Motor Vehicles or from WebKPF, a personal identity database that I routinely use in the course of my official duties and that has proven reliable. I am informed that the FBI

[18] A stamp on the exterior packaging of narcotics generally means that the narcotics are associated with a particular Mexican cartel.

investigative team has determined, based on these comparisons, that the person that the person identified in this investigation as **Hernandez** appears to be the same person who appears in the known photograph of **Hernandez**; that the FBI investigative team has determined, based on these comparisons, that the person that the person identified in this investigation as **Gonzalez** appears to be the same person who appears in the known photograph of **Gonzalez**; that the FBI investigative team has determined, based on these comparisons, that the person that the person identified in this investigation as **Baeza-Bravo** appears to be the same person who appears in the known photograph of **Baeza-Bravo**; and that the FBI investigative team has determined, based on these comparisons, that the person that the person identified in this investigation as **Vidal** appears to be the same person who appears in the known photograph of **Vidal**.

b. **<u>McCurin</u>**

221. On September 16, 2016, at 8:45a.m., **Gonzalez** sent a text message to **McCurin** and stated, "This is hector I need some wrk.10." At 8:46 a.m., **McCurin** called **Gonzalez**. **Gonzalez** asked **McCurin** what kind of "work" he had. **McCurin** stated that he had "the same shit for the 16" and asked if **Gonzalez** wanted the "smoke or the other shit." **McCurin** said that he had "Dippo" and wanted 16 for it. **Gonzalez** stated that he would call **McCurin** back.

222. At 8:55 a.m., **Gonzalez** called **McCurin**, and asked if he had one on hand. **McCurin** said that he did have one on hand and will bring it up to Gonzalez.

223. At 9:08 a.m., **McCurin** contacted **Gonzalez** and asked **Gonzalez** where he was. **Gonzalez** replied that he was at the store. **McCurin** asked if they were going to meet at the shop. **Gonzalez** confirmed and **McCurin** said that he would meet at **Gonzalez's** shop.

224. At approximately 9:15 a.m., FBI surveillance units observed **McCurin** meeting with **Gonzalez** at **A-3**. Shortly after the meeting between **Gonzalez** and **McCurin**, **McCurin** confronted two members of the surveillance team, independently. **McCurin** confronted a Task Force Officer (TFO), took photos and followed the Officer for several miles. The TFO was shown a California Department of Motor Vehicle photo of **McCurin** and the TFO confirmed that it was **McCurin** who had confronted him.

2. **<u>Identification of Locations in Table Three</u>**

a. **<u>A-1</u>**

225. As stated above, in **<u>Table Three</u>**, **Hernandez** resides at 2025 28th Street, #103, Sacramento, California. I make this statement because, among other things:

(a) FBI surveillance has seen **Hernandez**'s vehicle (**V-1**, described above) parked outside the residence on multiple occasions over the last four months.

(b) Based on Precise Location Data obtained by a search warrant on **Hernandez's** cellular telephone, which expired on September 12, 2016, it appeared that **Hernandez** was regularly the vicinity of **A-1** in the evening hours.

(c) Hernandez's residence at this location was confirmed by the building apartment manager on March 8, 2016.

b. **A-2**

226. As stated above, in **Table Three**, **Gonzalez** resides at 510 Bowman Avenue, Sacramento, California. I make this statement because, among other things:

(a) Gonzalez is listed as the owner of this property on Accurint, which is a commercial service that provides instant access to a comprehensive database of public records. I have often used Accurint in the course of my official duties and have found it reliable.

(b) On September 21, 2015, at 9:37 a.m., authorized wiretap interception of **Gonzalez's** phone, **Gonzalez** called an unknown man. At the end of their conversation—which, based on my training and experience, seemed related to narcotics sales—**Gonzalez** stated that he would send his address. Later, at 10:48 a.m., **Gonzalez** sent the man the address: "510 Bowman, Avenue, Sacramento, CA 95833."

(c) On September 29, 2015 at 12:09 p.m., **Gonzalez** exchanged a series of text messages with an Ohio telephone number. **Gonzalez** said, "Please send out today." The response from the Ohio number was, "He gave me 45 the rest be out tomorrow going to pick up today what address??" The Ohio number then sent another text message with a United States Postal Service tracking number, "EI 826585540 US." **Gonzalez** responded, "Oh thnk u." On October 1, 2015, agents conducted a search warrant (commonly referred to as a "Sneak and Peek Warrant") on the United States Postal Service package sent from Ohio to **Gonzalez**. The package was addressed to "Hector Gonzales," at 510 Bowman Ave, Sacramento, CA, 95833. The package contained $4,500 in cash, as indicated in previous text message to **Gonzalez** on September 29, 2015.

(d) On March 10, 2016, FBI surveillance units saw **Gonzalez** working on a vehicle outside this location. The surveillance units saw him going in and out of this location a couple of times.

c. **A-3**

227. As stated above, in **Table Three**, **Gonzalez** is associated with a restaurant called Mariscos El Camaron, which is located at 3134 Northgate Boulevard, Sacramento, California. I make this statement because, among other things:

(a) As indicated above, many of the transactions in which **Gonzalez** participated involved Mariscos El Camaron in some way. See, for example, pages 13-21, 23-25, and 28.

(b) Documents that FBI obtained from the Office of the Secretary of State of California indicate that Gonzalez is the owner of "Mariscos El Camaron LLC."

(c) As of March 3, 2016, the records of the Sacramento Municipal Utility District ("SMUD") show that that the utilities for A-3 are subscribed in the name of **Gonzalez**.

d. **A-4**

228. As stated above, in **Table Three**, **McCurin** resides at 420 Wintergarden Avenue, Sacramento, California. I make this statement because, among other things:

(a) The utilities for this location are subscribed in the name of a woman identified here as "SL," whom FBI believes to be **McCurin's** girlfriend. FBI believes SL to be **McCurin's** significant other because she is listed as a "G-Friend" under the "Next of Kin" section of WebKPF, a personal identity database that I routinely use in the course of my official duties and that has proven reliable. Moreover, Facebook posts and photos indicate that **McCurin** is in a relationship with SL.

(b) In November 2015, a mailcover was conducted on **A-4**. **McCurin** received mail at that location from Xfinity, dated November 16, 2015 and Comcast, dated November 16, 2015.

(c) An FBI TFO saw **McCurin** at this location on March 8, 2016.

e. **A-5**

229. As stated above, in **Table Three**, **Vidal** resides at 3610 Martin Luther King Boulevard, Sacramento, California. I make this statement because, among other things:

(a) As indicated above, many of the transactions in which **Vidal** participated involved **A-5** in some way. See, for example, pages 8-12.

(b) **Vidal** is listed as the owner of this property on Accurint.

f. **A-6**

230. As stated above, in Table Three, **Baeza-Bravo** resides at 1655 Scarlett Ash Avenue, Sacramento, California. I make this statement because, among other things:

(a) As indicated above, many of the transactions in which **Baeza-Bravo** participated involved **A-6** in some way. See, for example, pages 14-16.

(b) **Baeza-Bravo's** residing at this location was confirmed by the building's apartment manager on March 4, 2016.

3. **McCurin's Felony Record**

231. I am informed, based on FBI review of a criminal history database that I have often used and found reliable, that **McCurin** has sustained two felony convictions: one for Carjacking, in violation of California Penal Code § 215, on March 18, 1998, and one for Possession of a Controlled Substance for Sale, in violation of California Health & Safety Code § 11378 on August 2, 2002. Felons are prohibited from possessing any firearms and/or ammunition, and are prohibited from being a firearms dealer.

4. **Ongoing Communication between Gonzalez and McCurin**

232. A review of calls between **McCurin** and **Gonzalez** during the court-authorized wiretap interception of **Gonzalez's** telephone indicated that their telephonic conversations were often coded and appeared to be regarding guns and/or drug trafficking. The calls appeared to be strictly business-oriented and were not social in nature. Based on a pen register that expired on February 12, 2016, **Gonzalez** and **McCurin** were in contact with one another as recently as February 11, 2016.

5. **Status of Mariscos El Camaron**

233. Recently, the restaurant Mariscos El Camaron (referred to in many of the controlled buys described above, and identified in **Table Three** above as **A-3**) appeared temporarily closed. However, surveillance on Friday, March 11, 2016, indicated that Mariscos El Camaron is once again open.

D. **Information Derived from Training and Experience**

234. Based on my training as a law-enforcement agent, my experience investigating narcotics offenses and firearms-related offenses, and my discussions with other law-enforcement agents concerning their training and experience as to these types of offenses, I know that the following statements are true:

(a) Individuals involved in drug dealing and illegal firearms sales often maintain at their residence, vehicles, and persons records and ledgers evidencing their trafficking activities in order to keep track of the ordering, purchasing, storage, distribution, and transportation of their products. Even after the drugs and/or firearms are sold, documentary records and ledgers often remain for long periods of time to memorialize past transactions, the status of accounts receivable and accounts payable, and the names and telephone numbers of suppliers, customers and co-conspirators. Since drug traffickers and firearm traffickers will in many instances "front" (that is, sell on consignment) their products to their customers—or, alternatively, will be "fronted" their products from their suppliers, such record-keeping is necessary to keep track of amounts paid and owed, and such records will also be maintained close at hand so as to readily ascertain current balances. Thus, drug traffickers and gun traffickers will often keep "pay and owe" records to show balances due for products sold in the past ("pay") and for payments expected ("owe") as to the trafficker's supplier and the trafficker's dealer(s). Additionally, drug traffickers and gun traffickers must maintain telephone and address listings of clients and suppliers and keep them immediately available in order to efficiently conduct their business. These records are often maintained not only on paper, but also on mobile or cellular phones.

(b) Individuals involved in drug dealing and illegal firearms sales often place their assets in names other than their own to avoid detection of those assets by law enforcement and the Internal Revenue Service (IRS). Those persons are commonly family members, friends, and associates who accept title of assets to avoid discovery and detection. Traffickers also often place assets in the ownership of corporate entities to avoid detection by law enforcement agencies and, although these assets are in other individual(s) or corporate names, the traffickers continue to use these assets and exercise dominion and control over them. Finally, traffickers

typically keep records of those registrations and transactions in their residence.

(c) Individuals involved in drug dealing must often rely on others to obtain the drugs and to help them market the drugs. Drug traffickers/distributors use other people's vehicles (and their own vehicles) to conduct narcotics activities; often drug dealers have their vehicles registered in someone else's name, often times in their relatives' or girlfriends' names. Evidence of the identities of these co-conspirators is often maintained at their residences, in their vehicles, and on their persons.

(d) Individuals involved in drug dealing and illegal firearms sales earn sums of money and often try to legitimize these profits. In order to do this, they attempt to secrete, transfer, and conceal the money by, among other methods: (a) placing assets in names other than their own name to avoid detection while maintaining control; (b) laundering the money through what appear to be a legitimate business or businesses; (c) hiding the money in their homes, safes, and safety deposit boxes; or (d) using the money to buy assets which are hard to trace by law enforcement. Records of these transactions are often found at their residence, in their vehicles, stash locations and on their persons.

(e) Individuals involved in drug dealing and illegal firearms sales often maintain large amounts of U.S. currency on hand in order to finance their ongoing sales of contraband. In addition, other assets generated by their illegal sales of drugs and/or firearms—or other assets purchased with cash earned, such as vehicles, precious metals, and stones, and jewelry—are typically kept by drug and gun traffickers at their residences, in their vehicles, stash locations and on their persons, in order to secure their wealth while avoiding detection by authorities. Likewise, drug and gun traffickers often use wire transfers, cashier's checks, and money orders to obtain their contraband. Evidence of such financial transactions and records relating to income and expenditures of money and wealth in connection with illegal trafficking activities would also typically be maintained in residences.

(f) Individuals involved in drug dealing often maintain weapons, firearms, and ammunition on their person or at their residence and in their automobiles in order to protect themselves and guard their drugs and drug profits, and for enforcement purposes during their drug dealings. These weapons and firearms are used and can be used as an instrumentality of the crime of possession and distribution of drugs.

(g) Individuals who illegally possess firearms—for example, felons—very often possess ammunition in their residence. Moreover, this ammunition is often stored in multiple places in the residence. As such, it can be critical evidence that the individual knowingly possessed the firearm.

(h) Individuals involved in drug dealing and illegal firearms sales often take, or cause to be taken, photographs of themselves, their associates, their property, and the products that they have sold and have on-hand for sale, and usually maintain these photographs in their possession.

(i) Premises used by individuals involved in drug dealing and illegal firearms

sales usually contain items evidencing the identity of persons occupying, possessing, residing in, owning, frequenting or controlling the premises. Such items include canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, keys, and locks. These items are often critical in establishing a connection between a person and a place.

(j) Individuals involved in drug dealing and illegal firearms sales often conceal evidence of their illegal business activities in vehicles outside their residence in order to prevent detection and seizure by officers conducting search warrants at the residence. Likewise, these individuals often conceal evidence of their illegal business activities by burying those items on the grounds surrounding their residence in order to prevent detection and seizure by officers conducting search warrants at the residence.

(k) Individuals involved in long-term drug dealing, specifically those who keep the same residence and telephone number over the long term, tend to continue their drug dealing without obvious changes in their operations in the same pattern and practice as in the past. Further, individuals who sell drugs for an extended period are likely to maintain fruits, instrumentalities, and records of drug sales at their residence.

(l) Where criminal activity is long-term or ongoing, equipment and records of the crime will be kept for some period of time. United States v. Greany, 929 F.2d 523, 525 (9th Cir. 1991). Moreover, in the case of drug dealers, evidence is likely to be found where the dealers live. United States v. Angulo-Lopez, 791 F.2d 1394, 1399 (9th Cir. 1986).

(m) Individuals involved in drug dealing often maintain at their residence paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances. Likewise, individuals involved in illegal firearms sales typically maintain at their residence paraphernalia for identifying, storing, packaging, and distributing firearms.

(n) Individuals involved in drug dealing and illegal firearms sales very often use mobile telephones to communicate with one another, either by voice or text message. Traffickers in contraband and illegal firearms often do not subscribe their phones in their own names often to conceal their identity or thwart law enforcement detection. These traffickers also "drop" (discontinue use of) their phones often for the same reason. Mobile telephones preserve in their memory a history of incoming, outgoing, and missed calls, which can lead to evidence of the telephone numbers of other narcotics traffickers and the dates and times that they and/or the mobile telephone user dialed one another's telephones. Mobile telephones also contain in their memory a telephone book. This allows the user to store telephone numbers and other contact information. The information stored in a telephone used by a narcotics trafficker or a firearms trafficker is evidence of this person's associations, some of which are related to his or her illegal business. Mobile telephones also contain in their memory text messages sent, received, and drafted by the mobile telephone user. The text message history of a narcotics trafficker's, or illegal firearms trafficker's, mobile telephone can contain important evidence of this illegal trafficking because it can show the trafficker's

communications or planned communications and the telephone numbers of those with whom the trafficker communicated or intended to communicate. Mobile telephones also have a voicemail function that allows callers to leave messages when the telephone user does not answer. Drug and firearm traffickers sometimes leave voice messages for each other and this is evidence both of their mutual association and possibly their joint criminal activity. Mobile telephones can also contain other user-entered data files such as "to-do" lists, which can provide evidence of crime when used by a narcotics or firearms trafficker. Mobile telephones can also contain photographic data files, which can be evidence of criminal activity when the user was a narcotics or firearms trafficker who took pictures of evidence of crimes. Mobile telephone companies also store the data described in this paragraph on their own servers and associate the data with particular users' mobile telephones.

(o) Individuals involved in illegal sales of assault weapons and other firearms often have will often keep such firearms in their possession for a period of time before the weapon is sold, as they often procure a weapon before finding a buyer for it. This is particularly the case with individuals who traffic in weaponry that is relatively difficult to obtain, such as fully automatic assault rifles, silencers, and high-capacity ammunition drums.

235. In summary, persons involved in the criminal activities at issue in this Affidavit often maintain at their residences, in their vehicles, and on their persons the items described in **Attachment B.**

[***Remainder of page blank.***]

## III. CONCLUSION

236. Based upon the information set forth above, I submit that there is probable cause to believe that **Hernandez**, **Gonzalez**, **McCurin**, **Baeza-Bravo**, and **Vidal** have committed the offenses alleged below, in **Table Four** (which is simply **Table Two**, with additional detail):

| **Table Four**[19] | |
|---|---|
| 1 - **Hernandez** | 21 U.S.C. § 841(a)(1), Distribution of Heroin<br>October 7, 2015<br>21 U.S.C. § 841(a)(1), Distribution of Cocaine<br>December 22, 2015<br>21 U.S.C. § 841(a)(1), Distribution of Methamphetamine<br>February 3, 2016 |
| 2 - **Gonzalez** | 21 U.S.C. § 841(a)(1), Distribution of Heroin<br>October 7, 2015<br>21 U.S.C. § 841(a)(1), Distribution of Methamphetamine<br>May 12, 2015<br>May 28, 2015<br>June 3, 2015<br>July 17, 2015<br>August 12, 2015<br>September 2, 2015<br>September 18, 2015 |

[19] Note that **Table Four** does not purport to capture all the criminal activity that **Hernandez**, **Gonzalez**, **McCurin**, **Baeza-Bravo**, and **Vidal** have engaged in during the course of this investigation. It does not even purport to capture all the criminal activity that this Affidavit demonstrates these individuals have engaged in. Instead, it only summarizes the evidence concerning the offenses in connection with which arrest warrants are sought.

| | |
|---|---|
| 3 - **McCurin** | 18 U.S.C. § 922(a)(1)(A), Unlicensed Dealing in Firearms<br>September 19, 2015<br>September 24, 2015<br>September 29, 2015<br>October 13, 2015<br>18 U.S.C. § 922(g)(1), Felon in Possession of Firearm<br>September 19, 2015<br>September 24, 2015<br>September 29, 2015 |
| 4 - **Baeza-Bravo** | 21 U.S.C. § 841(a)(1), Distribution of Methamphetamine<br>October 8, 2014<br>April 16, 2015<br>May 12, 2015 |
| 5 - **Vidal** | 21 U.S.C. § 841(a)(1), Distribution of Methamphetamine<br>July 3, 2014<br>July 29, 2014<br>August 20, 2014<br>October 8, 2014<br>December 18, 2014 |

237. On the same basis, I also submit that there is probable cause to believe that the items specified in **Attachment B** are, or will be, at the four specified locations in **Attachment A**, such that the court should issue warrants authorizing law enforcement agents to enter the four specified locations in **Attachment A** in order to search for, and seize and further examine, the items specified in **Attachment B**. Specifically, with respect to—

(a) **A-1**, that submission is based mainly on: the evidence concerning **Hernandez's** criminal conduct (as summarized above), and the case-specific information linking that conduct to his place of residence (see, for example, the conversation described on page 20, and the surveillance described on page 25), as well as the training-and-experience information on pages 30-33.

(b) **A-2**, that submission is based mainly on: the evidence concerning **Gonzalez's** criminal conduct (as summarized above), and the case-specific information linking that conduct to his place of residence (see, for example, the receipt-of-cash information on page 28), as well as the training-and-experience information on pages 30-33.

(c) **A-3**, that submission is based mainly on the evidence concerning **Gonzalez's** criminal conduct (as summarized above), and the information

linking that conduct to his place of business (see pages 13-21, 23-25, and 28), as well as the training-and-experience information on pages 30-33.

(d) **A-4**, that submission is based mainly on the evidence concerning **McCurin's** criminal conduct (as summarized above), and the case-specific information linking that criminal conduct to his place of residence (see, for example, page 22), as well as the training-and-experience information on pages 30-33.

## IV. REQUEST TO SEAL

238. Because this Affidavit and accompanying search warrants and arrest warrants reveal an on-going investigation, I request that they be sealed, except to the extent necessary to effectuate the purposes of the warrants (such as by law enforcement personnel), until further order of the Court in order to avoid premature disclosure of the investigation, guard against the flight of fugitives, and better ensure the safety of agents and others.

* * *

I declare under penalty and perjury the above information is true and correct based on my information and belief.

Preston H. Patton, Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before
me this 15th day of March, 2016:

Kendall J. Newman
United States Magistrate Judge

Approved as to Form:

Ross K. Naughton
Assistant U.S. Attorney

## ATTACHMENT A: PLACES TO BE SEARCHED

This warrant authorizes the search of the physical locations designated as

**A-1, A-2, A-3,** and **A-4,**

which are described as follows:

**A-1:**

**2025 28th Street, #103, Sacramento, California, including any and all attachments, attics, basements, garages, carports, outbuildings, appurtenances and grounds that are part of the rented space of unit number 103.**

Unit number 103 is located in a three-story multi-unit dwelling. The exterior of the structure is brown with tan and white trim. The building has a security gate on the first floor. The number "2025" are affixed to the building near the security gate. Unit number 103 is located on the first floor and is accessible through an interior hallway. The unit door is black in color and has the number "103" in gold affixed to the door.

At the bottom of this page is a recent picture of **A-1** that the FBI has taken in the course of this investigation.



**A-2:**

**510 Bowman Avenue, Sacramento, California, including any and all attachments, attics, basements, garages, carports, outbuildings, appurtenances and grounds.**

The one-story residence is white in color with white trim and a gray roof. The residence has a black security door which faces Bowman Avenue. There are red brick pillars near the front door and a black wrought iron gate in the driveway which leads to the back of the property. The number "510" is affixed to the dwelling next to a window on the right of the front door.

At the bottom of this page is a recent picture of **A-2** that the FBI has taken in the course of this investigation.



**A-3:**

**3134 Northgate Boulevard, Sacramento, California, including any and all attachments, attics, basements, garages, carports, outbuildings, appurtenances and grounds.**

The one-story business is beige in color. There are three windows and two doors facing Northgate Boulevard. A black wrought-iron gate blocks the south and east side of the building. There is a temporary sign on the wrought iron gate to the south of the building which reads, "Mariscos El Camaron Seafood Restaurant."

At the bottom of this page is a recent picture of **A-3** that the FBI has taken in the course of this investigation.



**A-4:**

**420 Wintergarden Avenue, Sacramento, California, including any and all attachments, attics, basements, garages, carports, outbuildings, appurtenances and grounds.**

The one-story residence is tan in color with brown trim and a brown roof. The front door of the residence faces Wintergarden Avenue. The number "420" is affixed to the dwelling to the left of the garage door.

At the bottom of this page is a recent picture of **A-4** that the FBI has taken in the course of this investigation.



**ATTACHMENT B: ITEMS TO BE SEARCHED FOR AND SEIZED**

The items to be searched for and seized under the authority of this warrant are, **by location**, as follows:

**Locations A-1, A-2, and A-3**

1) illegal narcotics of any and all type;

2) firearms of any and all type;

3) ammunition of any and all type;

4) financial records indicative of illegal narcotics sales, such as records of expenses incurred in obtaining chemicals and apparatus, "pay and owe records," billing receipts, shipping invoices, records showing income derived from sales of finished product as well as records of legitimate business, or lack thereof, and general living expenses;

5) financial records reflective of or consistent with attempts to launder the proceeds of illegal sales of contraband, such as records of large cash transactions, records of frequent cash transactions, and records of asset transfer;

6) photographs of substances that appear to be narcotics, or of items that appear to be firearms, whether or not packaged for sale;

7) paraphernalia for packaging, weighing, cutting, testing, distributing, and identifying controlled substances, such as scales, packaging equipment, inert cutting agents, paper bindles, plastic bags, buckets, and glass containers;

8) records regarding, and keys to, safety deposit boxes;

9) cash, precious metals and stones, and jewelry;

10) mobile and cellular phones;

11) vehicle registration information;

12) any unmarked chemicals found, whether in liquid or powder forms;

13) tax returns, tax-related records, and corporate records; and

14) items evidencing the identity of persons occupying, possessing, residing in, owning, or controlling the premises, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, keys, and locks.

**Location A-4**

1) firearms of any and all type;

2) ammunition of any and all type;

3) financial records indicative of illegal firearms sales, such as records of expenses incurred in obtaining chemicals and apparatus, "pay and owe records," billing receipts, shipping invoices, records showing income derived from sales; records of legitimate business, or lack thereof, and general living expenses;

4) financial records reflective of or consistent with attempts to launder the proceeds of illegal sales of contraband, such as records of large cash transactions, records of frequent cash transactions, and records of asset transfer;

5) photographs of items that appear to be firearms, whether or not packaged for sale;

6) paraphernalia for identifying, storing, packaging, and distributing firearms;

7) records regarding, and keys to, safety deposit boxes;

8) cash, precious metals and stones, and jewelry;

9) mobile and cellular phones;

10) vehicle registration information;

11) tax returns, tax-related records, and corporate records; and

12) items evidencing the identity of persons occupying, possessing, residing in, owning, or controlling the premises, such as canceled mail, deeds, leases, rental agreements, photographs, personal telephone books, diaries, utility and telephone bills, statements, identification documents, keys, and locks.